Title Order Number:
File Number:

## Exhibit "A"

Real property in the City of Santa Ana, County of Orange, State of California, described as follows:

PARCEL 1:

THAT PORTION OF BLOCK 14, IRVINES SUBDIVISION AS SHOWN ON A MAP RECORDED IN BOOK 1, PAGE 88 OF MISCELLANEOUS MAPS, RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF LOT 350 OF SAID BLOCK 14, SAID CORNER BEING ALSO THE INTERSECTION OF THE CENTER LINES OF LA LOMA DRIVE AND RED HILL AVENUE, AS SHOWN ON A MAP FILED IN BOOK 30, PAGE 48 OF RECORD OF SURVEYS IN THE OFFICE OF THE RECORDER OF SAID COUNTY; THENCE ALONG SAID CENTER LINE OF LA LOMA DRIVE, SOUTH 50°13'59" EAST 516.35 FEET; THENCE NORTH 39°48'03" EAST 416.52 FEET; SOUTH 53°42'59" EAST 72.51 FEET TO THE TRUE POINT OF BEGINNING; NORTH 39°48'03" EAST 241.92 FEET TO THE SOUTHWESTERLY LINE OF LOT A OF TRACT NO. 61, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 10, PAGE 5 OF MISCELLANEOUS MAPS, RECORDS OF SAID COUNTY; THENCE ALONG SAID SOUTHWESTERLY LINE; SOUTH 50°03'00" EAST 177.63 FEET TO THE MOST NORTHERLY CORNER OF THE LAND DESCRIBED IN DEED TO ELWOOD H. BEAR AND OTHERS, RECORDED MARCH 21, 1923 IN BOOK 462, PAGE 12 OF DEEDS; THENCE ALONG THE NORTHWESTERLY LINE OF THE LAND DESCRIBED IN SAID DEED, SOUTH 39°48'03" WEST 239.54 FEET TO THE MOST EASTERLY CORNER OF THE LAND DESCRIBED IN DEED TO MERTON D. BUTLER AND WIFE, RECORDED JUNE 10, 1957 IN BOOK 3935, PAGE 462 OF OFFICIAL RECORDS; THENCE ALONG THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN SAID DEED, NORTH 53°42'59" WEST 177.96 FEET TO AN ANGLE POINT THEREIN; THENCE NORTH 39°48'03" EAST 9.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR ROAD PURPOSES FOR INGRESS AND EGRESS TO AND FROM THE PROPERTY DESCRIBED IN PARCEL 1, SAID EASEMENT BEING 18 FEET IN WIDTH, OVER THAT CERTAIN PORTION OF BLOCK 14, IRVINES SUBDIVISIONS AS SHOWN ON A MAP RECORDED IN BOOK 1, PAGE 88 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE RECORDER, COUNTY OF ORANGE, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF LOT 350 OF SAID ABOVE-MENTIONED BLOCK 14, SAID CORNER BEING ALSO THE INTERSECTION OF THE CENTER LINE OF LA LOMA DRIVE AND RED HILL AVENUE; THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LOT 350, NORTH 39°51'04" EAST, 30.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID SOUTHEASTERLY LINE OF SAID LOT 350, NORTH 39°51'04" EAST 132.33 FEET; THENCE LEAVING SAID SOUTHEASTERLY LINE, SOUTH 87°09'15" EAST 419.85 FEET; THENCE SOUTH 53°42'59" EAST 253.00 FEET; THENCE SOUTH 36°17'01" WEST AT RIGHT ANGLES TO SAID LAST MENTIONED COURSE; 18.00 FEET; THENCE NORTH 53°42'59" WEST AT RIGHT ANGLES TO SAID LAST MENTIONED COURSE 247.60 FEET; THENCE NORTH 87°09'15" WEST 405.47 FEET; THENCE PARALLEL WITH SAID SOUTHEASTERLY LINE OF LOT 350, SOUTH 39°51'04" WEST 123.33 FEET; THENCE NORTH 50°13'59" WEST 18.00 FEET TO THE TRUE POINT OF BEGINNING.

16

LEGAL DESCRIPTION

PARCEL 3:

A NON-EXCLUSIVE RIGHT OF WAY FOR PIPE LINES TOGETHER WITH THE RIGHT TO CONVEY WATER
THROUGH THE SAME AND THE RIGHT TO USE, REPAIR, MAINTAIN AND REPLACE THE EXISTING PIPE
LINE AND RIGHT OF WAY FOR OTHER PUBLIC UTILITY PURPOSES, IN, OVER, ALONG AND ACROSS THE
FOLLOWING DESCRIBED STRIP;

A PORTION OF BLOCK 14 OF IRVINES SUBDIVISION, AS SHOWN ON A MAP RECORDED IN BOOK 1,
PAGE 88 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, DESCRIBED AS
FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF THE TRACT OF LAND CONVEYED TO ELWOOD H.
BEAR AND OTHER BY DEED RECORDED MARCH 21, 1923 IN BOOK 463, PAGE 12 OF DEEDS; THENCE
NORTH 53°42' WEST ALONG THE SOUTHWESTERLY LINE OF SAID TRACT OF LAND, 189.73 FEET TO
THE MOST WESTERLY CORNER OF SAID TRACT OF LAND; THENCE SOUTHWESTERLY TO THE MOST
NORTHERLY CORNER OF THE TRACT OF LAND CONVEYED TO M. B. WELLINGTON AND WIFE, BY DEED
RECORDED FEBRUARY 28, 1936 IN BOOK 809, PAGE 195 OF OFFICIAL RECORDS; THENCE SOUTH
53°42 EAST ALONG THE NORTHEASTERLY LINE OF SAID TRACT OF LAND CONVEYED TO M. B.
WELLINGTON AND WIFE AND THE SOUTHEASTERLY EXTENSION THEREOF, A DISTANCE OF 189.73
FEET TO THE NORTHEASTERLY CORNER OF THE TRACT OF LAND CONVEYED TO M. B. WELLINGTON
AND WIFE BY DEED RECORDED AUGUST 9, 1927 IN BOOK 77, PAGE 33 OF OFFICIAL RECORDS;
THENCE NORTHEASTERLY TO THE POINT OF BEGINNING.

APN: 502-081-13

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
RESIDENTIAL DIVISION

Recording Requested By:
T. DUFFY

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖    **96.00**

**2007000008779 02:26pm 01/05/07**

203 59 D11 31

0.00 0.00 0.00 0.00 90.00 0.00 0.00 0.00

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
CHRISTOPHER RIDDLE

██████████████ ——— [Space Above This Line For Recording Data] ———————————

████████████     ·     █████████████

[Escrow/Closing #]            [Doc ID #]

# DEED OF TRUST

MIN ███████████████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated DECEMBER 22, 2006 , together with all Riders to this document.

**(B) "Borrower"** is

MARSHALL S SANDERS, AND LYDIA O SANDERS, TRUSTEES OF THE MARSHALL AND LYDIA SANDERS TRUST DATED       APRIL 20, 1990

**CALIFORNIA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS**

Page 1 of 16

(vmp) -6A(CA) (0207)    CHL (08/05)(d)    VMP Mortgage Solutions, Inc. (800)521-7291        **Form 3005  1/01**
CONV/VA





**EXHIBIT 1**

DOC ID #: ▮▮▮▮▮▮▮

Borrower's address is
1621 KENSING LANE, SANTA ANA, CA 92705-3074
Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is
Countrywide Bank, N.A.
Lender is a NATL. ASSN.
organized and existing under the laws of THE UNITED STATES             .
Lender's address is
1199 North Fairfax St. Ste.500, Alexandria, VA 22314
**(D) "Trustee"** is
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02, Thousand Oaks91360
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated DECEMBER 22, 2006     . The Note states that Borrower owes Lender
ONE MILLION FOUR HUNDRED THIRTY FIVE THOUSAND and 00/100

Dollars (U.S. $ 1,435,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 01, 2037     .
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [XX] Other(s) [specify] INTER VIVOS REVOCABLE TRUST RIDER AND INTER VIVOS REVOCABLE TRUST AS BORROWER-ACKNOWLEDGMENT |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

DOC ID #: ▮▮▮▮▮▮▮▮

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                          of                          ORANGE                          :
[Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 502-081-13                                    which currently has the address of
1621 KENSING LANE, SANTA ANA                                    ,
[Street/City]
California 92705-3074 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

VMP ®-6A(CA) (0207)        CHL (08/05)        Page 3 of 16        Form 3005  1/01

DOC ID #:

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

-6A(CA) (0207)    CHL (08/05)    Page 4 of 16    Form 3005  1/01

DOC ID #:

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

-6A(CA) (0207)    CHL (08/05)    Page 5 of 16    Form 3005 1/01

DOC ID #: ███████████

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

23

DOC ID # ██████████

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: ▮

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

DOC ID # ███████████

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

DOC ID #: ███████████

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Order: ███████  Doc: OR:2007 00008779              Page 10 of 31    Created By: srangel.lpsdefault.com    Printed: 4/10/2014 11:58:43 AM PST

27

DOC ID #: ███████████

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

VMP® -6A(CA) (0207)          CHL (08/05)          Page 11 of 16                    Form 3005 1/01

Order: ███████   Doc: OR:2007 00008779          Page 11 of 31    Created By: srangel.lpsdefault.com    Printed: 4/10/2014 11:58:43 AM PST

28

DOC ID #: ▮▮▮▮▮▮▮▮▮

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

DOC ID #: ▮▮▮▮▮▮▮▮

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

30

DOC ID #: ██████████████

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

DOC ID #: █████████████

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ as a Trustee _____ (Seal)
                                                                      -Borrower
MARSHALL S. SANDERS, INDIVIDUALLY AND AS TRUSTEE
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

Lydia O. Sanders as a Trustee (Seal)
                                                                      -Borrower
LYDIA O. SANDERS, INDIVIDUALLY AND AS TRUSTEE
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____ (Seal)
                                                                      -Borrower

_____ (Seal)
                                                                      -Borrower

DOC ID #: ▮▮▮▮▮▮▮

State of California
County of Orange                                    } ss.

On Dec 26, 2006          before me, Stacey Griffin , Notary Public
                                                    personally appeared
Marshall S. Sanders  and  Lydia O. Sanders

_____ , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

STACEY GRIFFIN
COMM. # 1701242
NOTARY PUBLIC·CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires
November 24, 2010

-5A(CA) (0207)        CHL (08/05)         Page 16 of 16                    Form 3005  1/01

Recording Requested By:
T. DUFFY

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
CHRISTOPHER RIDDLE

—————————————————— [Space Above This Line For Recording Data] ——————————————————

[Escrow/Closing #]                [Doc ID #]

# INTER VIVOS REVOCABLE TRUST RIDER

**DEFINITIONS USED IN THIS RIDER.**

    (A) "Revocable Trust." The
THE MARSHALL AND LYDIA SANDERS TRUST
created under trust instrument dated    APRIL 20, 1990        , for the benefit of
MARSHALL S. SANDERS

    (B) "Revocable Trust Trustee(s)."
MARSHALL S. SANDERS

trustee(s) of the Revocable Trust.
    (C) "Revocable Trust Settlor(s)."
MARSHALL S. SANDERS

settlor(s) of the Revocable Trust signing below.
    (D) "Lender."
Countrywide Bank, N.A.
    (E) "Security Instrument." The Deed of Trust and any riders thereto of the same date as this Rider given to
secure the Note to Lender of the same date and covering the Property (as defined below).
    (F) "Property." The property described in the Security Instrument and located at:
        1621 KENSING LANE, SANTA ANA, CA 92705-3074
          [Property Address]

CALIFORNIA INTER VIVOS REVOCABLE TRUST RIDER, FANNIE MAE
             Page 1 of 3
VMP ®-372R(CA) (0405)  CHL (06/04)(d)  VMP Mortgage Solutions, Inc. (800)521-7291

Initials: _____    5/04




DOC ID #:

**THIS INTER VIVOS REVOCABLE TRUST RIDER** is made this TWENTY-SECOND     day of DECEMBER, 2006   , and is incorporated into and shall be deemed to amend and supplement the Security Instrument.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, the Revocable Trust Trustee(s), and the Revocable Trust Settlor(s) and Lender further covenant and agree as follows:

**A. ADDITIONAL BORROWER(S)**

The term "Borrower" when used in the Security Instrument shall refer to the Revocable Trust Trustee(s), the Revocable Trust Settlor(s), and the Revocable Trust, jointly and severally. Each party signing this Rider below (whether by accepting and agreeing to the terms and covenants contained herein or by acknowledging all of the terms and covenants contained herein and agreeing to be bound thereby, or both) covenants and agrees that, whether or not such party is named as "Borrower" on the first page of the Security Instrument, each covenant and agreement and undertaking of the "Borrower" in the Security Instrument shall be such party's covenant and agreement and undertaking as "Borrower" and shall be enforceable by the Lender as if such party were named as "Borrower" in the Security Instrument.

BY SIGNING BELOW, the Revocable Trust Trustee(s) accepts and agrees to the terms and covenants contained in this Inter Vivos Revocable Trust Rider.

MARSHALL S. SANDERS ,INDIVIDUALLY AND AS
Trustee of the
THE MARSHALL AND LYDIA SANDERS TRUST

under trust instrument dated
APRIL 20, 1990

for the benefit of
MARSHALL S. SANDERS

- Borrower

Trustee of the
THE MARSHALL AND LYDIA SANDERS TRUST

under trust instrument dated
APRIL 20, 1990

for the benefit of

- Borrower

VMP®-372R(CA) (0405)       CHL (06/04)            Page 2 of 3

DOC ID #: ██████████

BY SIGNING BELOW, the undersigned Revocable Trust Settlor(s) acknowledges all of the terms and covenants contained in this Inter Vivos Revocable Trust Rider and agrees to be bound thereby.

_____ (Seal)
MARSHALL S. SANDERS, INDIVIDUALLY AND AS TRUSTEE          Revocable Trust Settlor
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____ (Seal)
LYDIA O. SANDERS, INDIVIDUALLY AND AS TRUSTEE           Revocable Trust Settlor
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

-372R(CA) (0405)          CHL (06/04)          Page 3 of 3

# ADJUSTABLE RATE RIDER
**(PayOption MTA Twelve Month Average Index - Payment Caps)**



[Escrow/Closing #]          [Doc ID #]

THIS ADJUSTABLE RATE RIDER is made this  TWENTY-SECOND        day of
DECEMBER, 2006       , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Countrywide Bank, N.A.

("Lender") of the same date and covering the property described in the Security Instrument and
located at:

1621 KENSING LANE
SANTA ANA, CA 92705-3074
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE
MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY
PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD
BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE
MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

• **PayOption MTA ARM Rider**

Page 1 of 6





DOC ID #: ████████

## 2. INTEREST
### (A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of    7.500 %. Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of    1.000 %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3.  The interest rate required by this Section 2 of the Note is the rate I will pay both before and after any default described in Section 7(B) of the Note.

### (B) Interest Rate Change Dates
The interest rate I will pay may change on the `first`            day of `FEBRUARY, 2007`        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index
Beginning with the first Interst Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding        `TWO & 575/1000` percentage point(s) (    2.575 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than    9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will make a payment every month.

● **PayOption MTA ARM Rider**
████████                    Page 2 of 6

DOC ID #: ██████

I will make my monthly payments on the FIRST ███ day of each month beginning on February, 2007 . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JANUARY 01, 2037 , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 4,615.53 , unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of FEBRUARY, 2008 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.500% of my prior monthly payment. This 7.500% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

• **PayOption MTA ARM Rider**

Page 3 of 6

DOC ID #: ██████████████

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My       unpaid       Principal       can       never       exceed       the       Maximum       Limit       equal       to       ONE HUNDRED FIFTEEN percent (       115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the tenth       Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the new interest rate in accordance with Section 2(D). I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

• **PayOption MTA ARM Rider**

████████████████                    Page 4 of 6

```
DOC ID #: ████████
```

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by

● **PayOption MTA ARM Rider**

████████

Page 5 of 6

DOC ID #: ████████

this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____                    -Borrower
MARSHALL S. SANDERS, INDIVIDUALLY AND AS TRUSTEE
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____                    -Borrower
LYDIA O. SANDERS, INDIVIDUALLY AND AS TRUSTEE
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____                    -Borrower

_____                    -Borrower

• **PayOption MTA ARM Rider**
████████                                    Page 6 of 6

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

———————————— [Space Above This Line For Recording Data] ————————————

# INTER VIVOS REVOCABLE TRUST AS BORROWER - ACKNOWLEDGMENT

Prepared By:
CHRISTOPHER RIDDLE

▮▮▮▮▮▮▮▮▮▮▮                        ▮▮▮▮▮▮▮▮▮
[Escrow/Closing #]                [Doc ID #]   

Initials:

**MULTISTATE INTER VIVOS REVOCABLE TRUST AS BORROWER/ACKNOWLEDGMENT**
Page 1 of 2
12/99

VMP®-373R (9912).02    CHL (09/01)(d)    VMP MORTGAGE FORMS - (800)521-7291

    

DOC ID #:  ████████

BY SIGNING BELOW, the undersigned, Settlor(s) of the

THE MARSHALL AND LYDIA SANDERS TRUST

Trust under trust instrument dated   APRIL 20, 1990         , for the benefit of
MARSHALL S. SANDERS
acknowledges all of the terms and covenants contained in this Security Instrument and any rider(s) thereto and
agrees to be bound thereby.

_____
MARSHALL S. SANDERS, INDIVIDUALLY AND AS TRUSTEE                              -Trust Settlor
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____
LYDIA O. SANDERS, INDIVIDUALLY AND AS TRUSTEE                                -Trust Settlor
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____
                                                                             -Trust Settlor

_____
                                                                             -Trust Settlor

VMP-373R (9912).02      CHL (09/01)          Page 2 of 2

# ACKNOWLEDGMENT

State of California               }
                                  } ss
County of  _Orange_               }

On _Dec 26, 2006_ before me, _Stacey Griffin_____, Notary Public,
*personally appeared*

_Marshall S. Sanders and Lydia O. Sanders_____,
*personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose names(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.*

STACEY GRIFFIN
COMM. # 1701242
NOTARY PUBLIC-CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires
November 24, 2010

Notary Seal

WITNESS my hand and official seal.

Signature: _Stacey Griffin_

Printed Name: _Stacey Griffin_

My Commission expires on: _Nov 24, 2010_

DESCRIPTION OF ATTACHED DOCUMENT:

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signers other than named above: _____

Prepared by: CHRISTOPHER RIDDLE

**Countrywide Bank, N.A.**

9445 FAIRWAY VIEW PLACE #210
RANCHO CUCAMONGA, CA 91730
Phone: (909)989-2293
Br Fax No.: (909)941-9473

DATE:          12/22/2006
CASE #:
DOC ID #:
BORROWER: MARSHALL S. SANDERS
PROPERTY ADDRESS: 1621 KENSING LANE
                  SANTA ANA, CA 92705-3074

## LEGAL DESCRIPTION EXHIBIT A

FHA/VA/CONV
• Legal Description Exhibit A




Title Order Number:

File Number: ████████

## Exhibit "A"

Real property in the City of Santa Ana, County of Orange, State of California, described as follows:

PARCEL 1:

THAT PORTION OF BLOCK 14, IRVINES SUBDIVISION AS SHOWN ON A MAP RECORDED IN BOOK 1, PAGE 88 OF MISCELLANEOUS MAPS, RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF LOT 350 OF SAID BLOCK 14, SAID CORNER BEING ALSO THE INTERSECTION OF THE CENTER LINES OF LA LOMA DRIVE AND RED HILL AVENUE, AS SHOWN ON A MAP FILED IN BOOK 30, PAGE 48 OF RECORD OF SURVEYS IN THE OFFICE OF THE RECORDER OF SAID COUNTY; THENCE ALONG SAID CENTER LINE OF LA LOMA DRIVE, SOUTH 50°13'59" EAST 516.35 FEET; THENCE NORTH 39°48'03" EAST 416.52 FEET; SOUTH 53°42'59" EAST 72.51 FEET TO THE TRUE POINT OF BEGINNING; NORTH 39°48'03" EAST 241.92 FEET TO THE SOUTHWESTERLY LINE OF LOT A OF TRACT NO. 61, AS SHOWN ON A MAP THEREOF RECORDED IN BOOK 10, PAGE 5 OF MISCELLANEOUS MAPS, RECORDS OF SAID COUNTY; THENCE ALONG SAID SOUTHWESTERLY LINE; SOUTH 50°03'00" EAST 177.63 FEET TO THE MOST NORTHERLY CORNER OF THE LAND DESCRIBED IN DEED TO ELWOOD H. BEAR AND OTHERS, RECORDED MARCH 21, 1923 IN BOOK 462, PAGE 12 OF DEEDS; THENCE ALONG THE NORTHWESTERLY LINE OF THE LAND DESCRIBED IN SAID DEED, SOUTH 39°48'03" WEST 239.54 FEET TO THE MOST EASTERLY CORNER OF THE LAND DESCRIBED IN DEED TO MERTON D. BUTLER AND WIFE, RECORDED JUNE 10, 1957 IN BOOK 3935, PAGE 462 OF OFFICIAL RECORDS; THENCE ALONG THE NORTHEASTERLY LINE OF THE LAND DESCRIBED IN SAID DEED, NORTH 53°42'59" WEST 177.96 FEET TO AN ANGLE POINT THEREIN; THENCE NORTH 39°48'03" EAST 9.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR ROAD PURPOSES FOR INGRESS AND EGRESS TO AND FROM THE PROPERTY DESCRIBED IN PARCEL 1, SAID EASEMENT BEING 18 FEET IN WIDTH, OVER THAT CERTAIN PORTION OF BLOCK 14, IRVINES SUBDIVISIONS AS SHOWN ON A MAP RECORDED IN BOOK 1, PAGE 88 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE RECORDER, COUNTY OF ORANGE, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF LOT 350 OF SAID ABOVE-MENTIONED BLOCK 14, SAID CORNER BEING ALSO THE INTERSECTION OF THE CENTER LINE OF LA LOMA DRIVE AND RED HILL AVENUE; THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LOT 350, NORTH 39°51'04" EAST, 30.00 FEET TO THE TRUE POINT OF BEGINNING; THENCE CONTINUING ALONG SAID SOUTHEASTERLY LINE OF SAID LOT 350, NORTH 39°51'04" EAST 132.33 FEET; THENCE LEAVING SAID SOUTHEASTERLY LINE, SOUTH 87°09'15" EAST 419.85 FEET; THENCE SOUTH 53°42'59" EAST 253.00 FEET; THENCE SOUTH 36°17'01" WEST AT RIGHT ANGLES TO SAID LAST MENTIONED COURSE; 18.00 FEET; THENCE NORTH 53°42'59" WEST AT RIGHT ANGLES TO SAID LAST MENTIONED COURSE 247.60 FEET; THENCE NORTH 87°09'15" WEST 405.47 FEET; THENCE PARALLEL WITH SAID SOUTHEASTERLY LINE OF LOT 350, SOUTH 39°51'04" WEST 123.33 FEET; THENCE NORTH 50°13'59" WEST 18.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 3:

A NON-EXCLUSIVE RIGHT OF WAY FOR PIPE LINES TOGETHER WITH THE RIGHT TO CONVEY WATER THROUGH THE SAME AND THE RIGHT TO USE, REPAIR, MAINTAIN AND REPLACE THE EXISTING PIPE LINE AND RIGHT OF WAY FOR OTHER PUBLIC UTILITY PURPOSES, IN, OVER, ALONG AND ACROSS THE FOLLOWING DESCRIBED STRIP;

A PORTION OF BLOCK 14 OF IRVINES SUBDIVISION, AS SHOWN ON A MAP RECORDED IN BOOK 1, PAGE 88 OF MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF THE TRACT OF LAND CONVEYED TO ELWOOD H. BEAR AND OTHER BY DEED RECORDED MARCH 21, 1923 IN BOOK 463, PAGE 12 OF DEEDS; THENCE NORTH 53°42' WEST ALONG THE SOUTHWESTERLY LINE OF SAID TRACT OF LAND, 189.73 FEET TO THE MOST WESTERLY CORNER OF SAID TRACT OF LAND; THENCE SOUTHWESTERLY TO THE MOST NORTHERLY CORNER OF THE TRACT OF LAND CONVEYED TO M. B. WELLINGTON AND WIFE, BY DEED RECORDED FEBRUARY 28, 1936 IN BOOK 809, PAGE 195 OF OFFICIAL RECORDS; THENCE SOUTH 53°42 EAST ALONG THE NORTHEASTERLY LINE OF SAID TRACT OF LAND CONVEYED TO M. B. WELLINGTON AND WIFE AND THE SOUTHEASTERLY EXTENSION THEREOF, A DISTANCE OF 189.73 FEET TO THE NORTHEASTERLY CORNER OF THE TRACT OF LAND CONVEYED TO M. B. WELLINGTON AND WIFE BY DEED RECORDED AUGUST 9, 1927 IN BOOK 77, PAGE 33 OF OFFICIAL RECORDS; THENCE NORTHEASTERLY TO THE POINT OF BEGINNING.

APN: 502-081-13

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

9.00

2009000698145 08:00am 12/30/09

106 402 A32 1

0.00 0.00 0.00 0.00 0.00 0.00 0.00 0.00

**LANDSAFE TITLE**

RECORDING REQUESTED BY:
RECONTRUST COMPANY
AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:
RECONTRUST COMPANY
1800 Tapo Canyon Rd.. CA6-914-01-94
SIMI VALLEY, CA 93063

RECORDING REQUESTED BY:
DPS
ON BEHALF OF:
**LS · SV**

TS No. ▮▮▮▮▮▮▮

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/~~MORTGAGE~~

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

**WELLS FARGO BANK, N.A., AS TRUSTEE FOR HARBORVIEW MORTGAGE LOAN TRUST MORTGAGE LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-1**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 12/22/2006, EXECUTED BY: MARSHALL S SANDERS, AND LYDIA O SANDERS, TRUSTEES OF THE MARSHALL AND LYDIA SANDERS TRUST DATED APRIL 20,1990,TRUSTOR: TO RECONTRUST COMPANY, N.A, TRUSTEE AND RECORDED AS INSTRUMENT NO. 2007000008779 ON 01/05/2007, OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE OF ORANGE COUNTY, IN THE STATE OF CALIFORNIA.

DESCRIBING THE LAND THEREIN: AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

DATED: 11/17/09

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

State of: **CALIFORNIA** )
County of: **VENTURA** )

BY: _____
T.Sevillano    Assistant Secretary

On **NOV 1 9 2009** before me. **JANET L. KOCH** , notary public, personally appeared
T.Sevillano
_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

JANET L. KOCH
Commission # 1776832
Notary Public - California
Ventura County
My Comm. Expires Oct 29, 2011

Signature _____ (Seal)
JANET L. KOCH

Form asgnmnt (01/09)

Recorded in Official Records, Orange County

Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖    9.00

**2011000620147 09:37am 12/06/11**

105 406 A32 1

0.00 0.00 0.00 0.00 0.00 0.00 0.00 0.00 0.00

RECORDING REQUESTED BY
FIRST AMERICAN TITLE COMPANY
AS AN ACCOMMODATION ONLY

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:

Bank of America, N.A.
400 National Way
Simi Valley, CA 93065

File N

---

## IMPORTANT NOTICE

Note: After having been recorded, this Assignment should be kept with the Note and Deed of Trust hereby assigned

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns, and transfers to BANK OF AMERICA, N.A., SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS SERVICING, LP all beneficial interest under that certain Deed of Trust dated December 22, 2006, executed by MARSHALL S SANDERS, and LYDIA O SANDERS, TRUSTEES OF THE MARSHALL AND LYDIA SANDERS TRUST DATED APRIL 20, 1990 to RECONTRUST COMPANY, N.A., as Trustee; and recorded January 5, 2007, as Document No. 2007000008779, in the Official Records of the County Recorder of Orange County, CA.

TOGETHER with the rights accrued or to accrue under said Deed of Trust including the right to have reconveyed, in whole or in part the real property described therein.

Dated: **NOV 2 8 2011**

Wells Fargo Bank, N.A., as Trustee for Harborview Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2007-4

Paul H. Webb
Assistant Vice President

ACKNOWLEDGMENT
State of _____California_____
County of _____Ventura_____ )

On_____**NOV 2 8 2011**_____ before me, _Milvia L Lopez, Notary Public_
(Insert name and title of the officer)

Personally appeared ____Paul H. Webb_____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____California_____ that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _Milvia L Lopez_ (Seal)

MILVIA L. LOPEZ
COMM. # 1946737
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. Sep. 1, 2015

50

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

12.00

*$ R 0 0 0 6 8 1 8 7 7 5 $*

2014000273238 2:09 pm 07/09/14
217 402 A32 F13   2
0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.00

Recording Requested By:
~~SELECT PORTFOLIO SERVICING, INC.~~

**FIRST AMERICAN TITLE**
When Recorded Return To:
BILL KOCH
SELECT PORTFOLIO SERVICING, INC.
3815 SOUTH WEST TEMPLE
SALT LAKE CITY, UT  84115

### CORPORATE ASSIGNMENT OF DEED OF TRUST

Orange, California   REFERENCE #: ▓▓▓▓▓ "SANDERS"
INVESTOR # ▓▓▓▓

For Value Received, BANK OF AMERICA NATIONAL ASSOCIATION SUCCESSOR BY MERGER TO BAC HOME
LOANS SERVICING LP, FKA COUNTRYWIDE HOME LOANS SERVICING, LP BY SELECT PORTFOLIO
SERVICING, INC. ITS ATTORNEY IN FACT at c/o SELECT PORTFOLIO SERVICING, INC., 3815 SOUTH WEST
TEMPLE, SALT LAKE CITY, UT  84115  hereby grants, assigns and transfers to WELLS FARGO BANK, N.A., AS
TRUSTEE, ON BEHALF OF THE HOLDERS OF THE HARBORVIEW MORTGAGE LOAN TRUST MORTGAGE
LOAN PASS-THROUGH CERTIFICATES, SERIES 2007-1  at C/O SELECT PORTFOLIO SERVICING, INC. 3815
SOUTH WEST TEMPLE, SALT LAKE CITY, UT  84115 all beneficial interest under that certain Deed of Trust dated
12/22/2006 , in the amount of $1,435,000.00, executed by MARSHALL S SANDERS, AND LYDIA O SANDERS,
TRUSTEES OF THE MARSHALL AND LYDIA SANDERS TRUST DATED APRIL 20, 1990 to MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") AS NOMINEE FOR COUNTRYWIDE BANK, N.A. ITS
SUCCESSORS AND ASSIGNS  and Recorded:  01/05/2007  as Instrument No.: 2007000008779 in Orange County ,
State of California and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed.

BANK OF AMERICA NATIONAL ASSOCIATION SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING
LP, FKA COUNTRYWIDE HOME LOANS SERVICING, LP BY SELECT PORTFOLIO SERVICING, INC. ITS
ATTORNEY IN FACT
On  JUN 2 5 2014

BILL KOCH, DOCUMENT CONTROL OFFICER



First American Title Insurance Company
submits this document for recordation
as a courtesy, for physical convenience on.
First American Title Insurance Company has
not examined this document for its validity,
sufficiency, or effect, if any, upon title to the
real property described herein

CORPORATE ASSIGNMENT OF DEED OF TRUST Page 2 of 2

STATE OF UTAH
COUNTY OF SALT LAKE

On __JUN 2 5 2014__, before me, KYLE J STERNER, a Notary Public in and for SALT LAKE in the State of UTAH, personally appeared BILL KOCH, DOCUMENT CONTROL OFFICER,  BANK OF AMERICA NATIONAL ASSOCIATION SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING LP, FKA COUNTRYWIDE HOME LOANS SERVICING, LP BY SELECT PORTFOLIO SERVICING, INC. ITS ATTORNEY IN FACT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

KYLE J STERNER
Notary Expires: 09/24/2016  #659205

> KYLE J. STERNER
> Notary Public  State of Utah
> My Commission Expires on:
> September 24, 2016
> Comm. Number: 659205

(This area for notarial seal)

Prepared by: CHRISTOPHER RIDDLE

LOAN # ▮

# ADJUSTABLE RATE NOTE
### (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

DECEMBER 22, 2006                      SANTA ANA                      CALIFORNIA
[Date]                                  [City]                            [State]

1621 KENSING LANE, SANTA ANA, CA 92705-3074
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $ 1,435,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed        115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is Countrywide Bank, N.A.
I will make all payments under this Note in the form of cash, check or money order.
    I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
    **(A)   Interest Rate**
    Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of      7.500 %.  Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of      1.000 %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3.  The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

    **(B)   Interest Rate Change Dates**
    The interest rate I will pay may change on the first          day of FEBRUARY, 2007          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

    **(C)   Index**
    Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates

● PayOption ARM Note - MTA Index
1E306-XX (12/05)(d)                               Page 1 of 5




**EXHIBIT 3**

(H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO & 575/1000                     percentage point(s)    2.575 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than    9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**

**(A)  Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first             day of each month beginning on FEBRUARY 01, 2007       . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   JANUARY 01, 2037       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $4,615.53            , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first                 day of FEBRUARY, 2008   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than    7.500% of my prior monthly payment. This 7.500% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number    1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date

● **PayOption ARM Note - MTA Index**
1E306-XX (12/05)                          Page 2 of 5

in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN                    percent
(     115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)   Required Full Payment**
On the tenth           Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)   Payment Options**
After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the new interest rate in accordance with Section 2(D). I may be given the following Payment Options:
   **(i)   Interest Only Payment:** the amount that would pay the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
   **(ii)   Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
   **(iii)   15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.   NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me



that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**
    **(A)    Late Charges for Overdue Payments**
    If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

    **(B)    Default**
    If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

    **(C)    Notice of Default**
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D)    No Waiver By Note Holder**
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)    Payment of Note Holder's Costs and Expenses**
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**
    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
    Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**
    If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.    WAIVERS**
    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE**
    In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:
    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond

● **PayOption ARM Note – MTA Index**
**1E306-XX (12/05)**                                                              Page 4 of 5

LOAN #:

for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Trustee_

MARSHALL S. SANDERS, INDIVIDUALLY AND AS TRUSTEE                                          – Borrower
OF THE MARSHALL S. SANDERS AND LYDIA O. SANDERS
TRUST UNDER TRUST INSTRUMENT DATED 4-20-1990 FOR
THE BENEFIT OF MARSHALL S. SANDERS AND LYDIA O. SANDERS

_____                                          – Borrower

_____                                          – Borrower

_____                                          – Borrower

PAY TO THE ORDER OF:                          PAY TO THE ORDER OF:
COUNTRYWIDE HOME LOANS, INC.

WITHOUT RECOURSE                              WITHOUT RECOURSE
COUNTRYWIDE BANK, N.A.                        COUNTRYWIDE HOME LOANS, INC.

BY: _Laurie Meder_                           BY: _Michele Sjolander_

LAURIE MEDER, SVP                            MICHELE SJOLANDER, EVP

• **PayOption ARM Note - MTA Index**
**1E306-XX (12/05)**                          Page 5 of 5

Prepared by: CHRISTOPHER RIDDLE

Countrywide Bank, N.A.

DATE:        12/22/2006
BORROWER: MARSHALL S. SANDERS
CASE #:      ██████████
LOAN #:      ██████████
PROPERTY ADDRESS: 1621 KENSING LANE
                  SANTA ANA, CA 92705-3074

Branch    ██████████
9445 FAIRWAY VIEW PLACE #210
RANCHO CUCAMONGA, CA 91730
Phone:  (909)989-2293
Br Fax No.: (909)941-9473

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated DECEMBER 22, 2006 , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to Countrywide Bank, N.A. (the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "BORROWER'S RIGHT TO PREPAY" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. Such an advance payment of Principal is known as a "Prepayment." I may make partial or full Prepayments. When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. **My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.**

● Prepayment Penalty Addendum
1E337-XX (05/06)(d)

Page 1 of 2




LOAN #: ▊▊▊▊

If within the first THIRTY SIX months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note.  Interest will be calculated using the rate in effect at the time of prepayment.

All other terms and conditions of the above referenced Note remain in full force and effect.

_____
MARSHALL S. SANDERS                                    Borrower

_____
                                                       Borrower

_____
                                                       Borrower

_____
                                                       Borrower

● Prepayment Penalty Addendum
1E337-XX (05/06)                          Page 2 of 2

59

B 6D (Official Form 6D) (12/07)

In re **Marshall Sanders**,                     Case No. **8:14-bk-11663-ES**
_____                            _____
Debtor                                                      (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐  Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND AN ACCOUNT NUMBER (See Instructions Above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO. ▆▆▆▆<br>Countrywide Bank, N.A.<br>1199 N Fairfax St, Ste 500<br>Alexandria, VA 22314 | | H | 1/5/07 *<br>1st Trust Deed<br>SFR, 1621 Kensing<br>Ln, Santa Ana, CA<br>92705-3074 | | | X | 0 | 0 |
| | | | VALUE $ 750,000 | | | | | |
| ACCOUNT NO.<br>Washington Mutual | X | C | 2008<br>2d Trust Deed<br>(HELOC)<br>1621 Kensing Ln.<br>Santa Ana | | | X | 120,800 | 120,800 |
| | | | VALUE $ 750,000 | | | | | |
| ACCOUNT NO.<br>National City Mortgage<br>3232 Newmark Dr.<br>Miamisburg, OH 45342 | X | C | 6-29-03 *<br>1st Trust Deed<br>SFR: 3071 Iroquois<br>Tustin, CA 92782 | | | X | 325,000 | 0 |
| | | | VALUE $ 450,000 | | | | | |
| _1_ continuation sheets attached | | | Subtotal ▶<br>(Total of this page) | | | | $ 445,800 | $ 120,800 |
| | | | Total ▶<br>(Use only on last page) | | | | $ | $ |
| | | | | | | | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.) |

" * " denotes disputed.

60

**EXHIBIT 4**

B 6D (Official Form 6D) (12/07) – Cont.

2

In re **Marshall Sanders** ,          Case No. **8:14 - bk - 11663 - ES**
　　　　　　　Debtor                              (if known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS
(Continuation Sheet)

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND AN ACCOUNT NUMBER (See Instructions Above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN , AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO.  Washington mutual | X | C | 2005 2d Trust Deed (HELOC) SFR: "Iroquois"  VALUE $ 450,000 | | | X | 253,600 | 253,600 |
| ACCOUNT NO.  Washington mutual | | H | 2007 3d Trust Deed (HELOC) SFR: "Iroquois"  VALUE $ 450,000 | | | X | 250,000 | 250,000 |
| ACCOUNT NO. | | | VALUE $ | | | | | |
| ACCOUNT NO. | | | N/A  VALUE $ | | | | | |
| ACCOUNT NO. | | | VALUE $ | | | | | |

Sheet no.____ of ____ continuation sheets attached to Schedule of Creditors Holding Secured Claims

Subtotal (s) ▶
(Total(s) of this page)

$ 503,600    $ 503,600

Total(s) ▶
(Use only on last page)

$ 949,400    $ 624,400

(Report also on Summary of Schedules.)    (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.)

61

NoFeeRequired, CONVERTED, CLOSED

# U.S. Bankruptcy Court
## Central District Of California (Santa Ana)
### Bankruptcy Petition #: 8:10-bk-14682-ES

|  |  |
|---|---|
| *Date filed:* | 04/12/2010 |
| *Date converted:* | 04/26/2010 |
| *Date reopened:* | 04/26/2011 |
| *Date terminated:* | 09/26/2011 |
| *Debtor discharged:* | 02/02/2011 |
| *341 meeting:* | 08/12/2010 |
| *Deadline for objecting to discharge:* | 08/16/2010 |
| *Deadline for financial mgmt. course:* | 08/02/2010 |

*Assigned to:* Erithe A. Smith
Chapter 7
Previous chapter 13
Voluntary
Asset

*Debtor disposition:*  Standard Discharge

***Debtor***
**Marshall Sanders**
1621 Kensing Lane
Santa Ana, CA 92705-3074
ORANGE-CA
SSN / ITIN: xxx-xx-█

represented by **Kenneth A Roberts**
23276 S Pointe Dr #208
Laguna Hills, CA 92653
949-583-7326
Fax : 949-583-7565

***Trustee***
**Amrane (SA) Cohen (TR)**
770 The City Drive South Suite 8500
Orange, CA 92868
714-621-0200
*TERMINATED: 05/03/2010*

***Trustee***
**John M Wolfe (TR)**
5450 Trabuco Road
Irvine, CA 92620-5704
(800) 436-4646

***U.S. Trustee***
**United States Trustee (SA)**
411 W Fourth St., Suite 9041
Santa Ana, CA 92701-4593

| Filing Date | # | Docket Text |
|---|---|---|
|  | [1](#)<br>(45 pgs; 3 docs) | Chapter 13 Voluntary Petition . Receipt Number 0, Fee Amount $274 Filed by Marshall Sanders Chapter 13 Plan due by 4/26/2010. Statement - Form 22C Due: 4/26/2010. Summary of schedules due |

PRVDISCH, DEFER, APPEAL, NoFeeRequired, DISMISSED

# U.S. Bankruptcy Court
## Central District Of California (Santa Ana)
### Bankruptcy Petition #: 8:11-bk-24594-ES

|  |  |
|---|---|
| *Assigned to:* Erithe A. Smith | *Date filed:* 10/20/2011 |
| Chapter 11 | *Debtor dismissed:* 08/21/2012 |
| Voluntary | *341 meeting:* 11/30/2011 |
| Asset | *Deadline for objecting to discharge:* 01/30/2012 |

*Debtor disposition:* Dismissed for Other Reason

| | |
|---|---|
| ***Debtor***<br>**Marshall Samuel Sanders**<br>1621 Kensing Ln<br>Santa Ana, CA 92705<br>ORANGE-CA<br>SSN / ITIN: xxx-xx-■ | represented by **Marshall Samuel Sanders**<br>PRO SE |
| ***U.S. Trustee***<br>**United States Trustee (SA)**<br>411 W Fourth St., Suite 9041<br>Santa Ana, CA 92701-4593 | represented by **Nancy S Goldenberg**<br>411 W Fourth St Ste 9041<br>Santa Ana, CA 92701-8000<br>714-338-3416<br>Fax : 714-338-3421<br>Email: nancy.goldenberg@usdoj.gov |

| Filing Date | # | Docket Text |
|---|---|---|
| | [1](#)<br>(18 pgs; 3 docs) | Chapter 11 Voluntary Petition. Fee Amount $1039 Filed by Marshall Samuel Sanders Schedule D due 11/3/2011. Schedule E due 11/3/2011. Schedule F due 11/3/2011. Schedule G due 11/3/2011. Schedule H due 11/3/2011. Statement of Financial Affairs due 11/3/2011. List of Equity Security Holders due 11/3/2011. Statement - Form 22B Due: 11/3/2011.Statement of Related Case due 11/3/2011. Notice of available chapters due 11/3/2011. Statement of assistance of non-attorney due 11/3/2011. Verification of creditor matrix due 11/3/2011. Summary of schedules due 11/3/2011. Declaration concerning debtors schedules due 11/3/2011. Statistical Summary due 11/3/2011. Cert. of Credit Counseling due by 11/3/2011. Debtor Certification of Employment Income due by |

63

**Repeat-cacb, Incomplete, RepeatPACER, APPEAL, DISMISSED**

# U.S. Bankruptcy Court
## Central District Of California (Santa Ana)
### Bankruptcy Petition #: 8:13-bk-14049-ES

|  |  |
|---|---|
| *Assigned to:* Erithe A. Smith | *Date filed:* 05/07/2013 |
| Chapter 11 | *Debtor dismissed:* 10/04/2013 |
| Voluntary | *341 meeting:* 06/12/2013 |
| Asset | *Deadline for objecting to discharge:* 08/12/2013 |

*Debtor disposition:* Dismissed for Other Reason

| | |
|---|---|
| ***Debtor*** <br> **Marshall Samuel Sanders** <br> 1621 Kensing Ln <br> Santa Ana, CA 92705 <br> ORANGE-CA <br> SSN / ITIN: xxx-xx-■ | represented by **Marshall Samuel Sanders** <br> PRO SE <br><br> **Richard H Gibson** <br> 21031 Ventura Blvd., Suite 1006 <br> Woodland Hills, CA 91364 <br> 818-716-7950 <br> Fax : 818-716-7995 <br> Email: RickGibsonLaw@gmail.com <br><br> *TERMINATED: 07/26/2013* |
| ***U.S. Trustee*** <br> **United States Trustee (SA)** <br> 411 W Fourth St., Suite 9041 <br> Santa Ana, CA 92701-4593 | represented by **Nancy S Goldenberg** <br> 411 W Fourth St Ste 9041 <br> Santa Ana, CA 92701-8000 <br> 714-338-3416 <br> Fax : 714-338-3421 <br> Email: nancy.goldenberg@usdoj.gov |

| Filing Date | # | Docket Text |
|---|---|---|
|  | 1 <br> (15 pgs; 4 docs) | Chapter 11 Voluntary Petition. Fee Amount $1213 Filed by Marshall Sanders Schedule A due 05/21/2013. Schedule B due 05/21/2013. Schedule C due 05/21/2013. Schedule D due 05/21/2013. Schedule E due 05/21/2013. Schedule F due 05/21/2013. Schedule G due 05/21/2013. Schedule H due 05/21/2013. Schedule I due 05/21/2013. Schedule J due 05/21/2013. Statement of Financial Affairs due 05/21/2013. List of Equity Security Holders due 05/21/2013. Statement - Form 22B Due: 05/21/2013. Incomplete Filings due by 05/21/2013. (Attachments: # 1 List of 20 Largest |

64

## Costs (Attorney's Fees and Other Costs)

| Date | Description | Amount |
|---|---|---|
| 7/2/2009 | Property Inspection | $15.00 |
| 7/31/2009 | Property Inspection | $15.00 |
| 9/2/2009 | Property Inspection | $15.00 |
| 10/1/2009 | Property Inspection | $15.00 |
| 11/2/2009 | Property Inspection | $15.00 |
| 12/1/2009 | Property Inspection | $15.00 |
| 12/2/2009 | Recording Fees | $15.00 |
| 12/9/2009 | Title Fees | $1,529.00 |
| 1/4/2010 | Recording Fees | $9.00 |
| 1/7/2010 | Property Inspection | $15.00 |
| 2/9/2010 | Property Inspection | $15.00 |
| 3/8/2010 | Property Inspection | $15.00 |
| 4/1/2010 | Recording Fees | $12.00 |
| 4/5/2010 | Property Inspection | $15.00 |
| 4/19/2010 | Attorney/Trustee Fee | $520.00 |
| 4/19/2010 | Advertize/Publication | $245.00 |
| 4/19/2010 | Statutory Mailings | $71.88 |
| 4/19/2010 | Posting | $160.00 |
| 4/29/2011 | Recording Fees | $12.00 |
| 9/26/2012 | Broker Price Opinion | $89.00 |
| 10/8/2012 | Property Inspection | $15.00 |
| 1/31/2013 | Substitution Recording | $9.00 |
| 3/6/2013 | Trustee Fee | $700.00 |
| 3/6/2013 | NOD/Intent to Foreclose | $12.00 |
| 3/6/2013 | Trustee Sale Guarantee | $1,529.00 |
| 3/14/2013 | Statutory Mailings | $31.82 |
| 3/14/2013 | Statutory Mailings | $62.99 |
| | Interest on Advance | $319.76 |
| TBD | Motion for Relief From Stay Court Filing Fee | $176.00 |
| TBD | Bankruptcy Attorney Fee | $850.00 |
| **TOTAL** | | **$6,518.45** |

## Advances (Property Taxes, Insurance)

| Date | Description | Amount |
|---|---|---|
| | Beginning Balance | $41,424.09 |
| 3/9/2012 | County Tax | $6,663.64 |
| 11/20/2012 | County Tax | $6,486.29 |
| 3/13/2013 | County Tax | $6,486.29 |
| 11/13/2013 | County Tax | $7,067.31 |
| 1/14/2014 | Homeowners Insurance | $1,807.00 |
| 2/26/2014 | Hazard Insurance Refund | -$1,807.00 |
| 3/12/2014 | County Tax | $7,067.31 |
| **TOTAL** | | **$75,194.93** |

EXHIBIT 6